FILED

NOV 29 2012

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

IN THE
UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON-DIVISION


TREVOR LITTLE,
    DEFENDANT,                              Criminal.No.2-95-00198-02

        v.                                  Civil No. 2:12-8385

UNITED STATES OF AMERICA,
    Respondent,


PETITION FOR WRIT OF AUDITA QUERELA,PURSUANT
TO THE ALL WRITS ACT 28 U.S.C § 1651(a)


Defendant Trevor Little (hereinafter) referred to as Defendant
moves this court by way of the common law writ petition  for writ of
audita querela pursuant to the jurisdiction of 28 U.S.C § 1615(a).See
Wilson v. United States,2008 U.S.Dist.(W.D.Va.2008)("The Writ of
audita querela . . . and other common law writs, was specifically
abolished in federal Civil actions by amendments to Fed.R.Civ.P 60(b)
effective in 1948. The United States Supreme Court has recognized,
however, that the ancient writ of coram nobis is still available to
attack a criminal conviction, with jurisdiction vested under The All
Writs Act, 28 U.S.C § 1651(a),See United States v. Morgan,346 U.S.502
74 S.Ct 247, 98 L.Ed 248 (1954). Accordingly, Courts have generally
held that the writ of audita querela may also still be available under
extraordinary and extreme rare circumstances. United States v. Reyes,
945 F.2d 862, 865-866 (5th Cir.1991)(citing other cases). Specially,]
the writ of audita querela is available, if at all, where a legal

(i)

objection to a conviction arisen after conviction and could not have been raised in some other post-conviction such as a motion to vacate,set aside or correct sentence, pursuant to 28 U.S.C § 2255. <u>United States</u> <u>v. Holder</u>,936 F.2d 1,5 (1st Cir.1991)". The defense or discharge must be a legal defect inthe conviction");<u>United States v. Day</u>,(W.D.Va 2008) ("The writ of audita querela isused to challenge "a judgment that was correct at the time rendered, but which is rendered infirm by matters which arisen after its rendition". <u>United States v. reyes</u>,945 F.2d 862, 863 n.1 (5th Cir.1991)").

A writ of audita querela is a common law writ that has been abolished by the Rules of Civil Procedure, but has survived as a remedy for defective criminal convictions to fill the interstices of the federal post-conviction remedial framework."<u>United States v. Valdez-Pacheco</u>,237 F.3d 1077, 1079(9th Cir.2000)(quoting <u>Doe v. Ins</u>,120 F.3d 200,203 (9th Cir.1997),cited with approval in <u>In re Watkins</u>,223 Fed.Appx 265,2007 WL 1041035 (4th Cir.2007). The United States Supreme Court in <u>carlisle v.</u> <u>United States</u>, 517 U.S.416,428-29,116 S.Ct 1460,134 L.ED 2d 613 (1996) (quoting <u>Pennsylvania Bureau of Correction v. United States Marshal</u> <u>Service</u>, 477U.S.34,43, 106 S.CT 355, 88 L.ED 2d 613 (1985) stated that "the All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute").

Defendant was charged in a 12 count indictment, four counts alleged he violated 21 U.S.C §§ 846, 841(a)(1), 18 U.S.C §§ 1952(a)(3) and 2.

Defendant was arrested on december 12, 1995 and upon his arrest he fell off a rock cliff 50 feet plus on to route 21. The Defendant was hand cuffed and an ambulance was called due to the injuries he had suffered. At that point several police officers waited for the Charle-

ston Area Medical Center General Division (CAMC).

Defendant stayed in the hospital for approximately six (6) days in custody of the Charleston police who had him cuffed to the hospital bed the whole time defendant was there.

The Defendant was given demoral, morphine and various other pain prescribed medication / drugs upon his arrival to the CAMC.

In Dr.Frederick H.Armbrust "consultation summary" dated 12,13,1995 hours after the incident he stated in his radiographic evaluation, impression and recommendations in part as follows:

> "There is a fracture of the transverse process of
> L1 on the left. There is a fracture through the
> body of the vertebra on the left side just in front
> of the pedicle, which extends vertically through the
> vertebral body.
> "Impression: Concussion".
> "Recommendations: "Relative to the concussion,which
> suggests simple observation, I would anticipate
> that the patient could be immobilized, at least
> initally, in a thoracolumbia sacral orthosis, but
> surgical stablization could be considered in view
> of the nature of this patient's fracture."
> See(Exhibit -A attached)

In support of  his consultation summary Dr.Armbrust submitted an affidavit that the Defendant suffered a concussion upon impact of his fall from the 50 foot rock cliff. The Affidavits in part states as follows:

> "I, Dr.Frederick H. Armbrust,  being first duly sworn,
> upon my oath state:(1) I examined Mr.Trevor Little
> at the Charleston Area Medical Center on December 13,
> 1996 ...(2) As a result of my physical examination of
> Mr.Little and my review of Mr.Little's history and
> medical records, I found that Mr.Little suffered a
> concussion on December 12, 1996 (3) Based upon a
> standard of reasonable medical certainly, it is my
> opinion that a concussion will typically cause a
> loss of memory or disorientaion for up to one hour
> following the impact or trauma which causes the
> concussion;(4) Based upon a standard of reasonable

medical certainly certainty, it is my opinion that Mr.Little
suffered some degree of loss of memory or disorientation
during the period immediately following the impact or
trauma which caused his concussion".
See(Affidavit of Frederick H.Armbrust attahced)

While the defendant was being hospitalized detectives Joseph H.

Crawford, Brian W.Jones, Stephen G.Neddo, and George L.Henderson III

of the Metropolitan Drug Enforcement Network Team (herein) referred

to as MDent all alleged that he was making incriminating statements,at

the times they were guarding him.

A suppression hearing was heard on March 11 and April 10th 1996

to supress Defendant's allegedly verbal statements and the former

District Court Chief Judge denied the motion. The district court in

part held as follows:

> "The Court considered significant the time lapse between
> Defendant trevor Little's arrest and arraigment. The
> Court found the lapse was justified in this case because
> of Defendant's need for hospitalization and treatment of
> his significant injuries. The court found the evidence
> clearly demonstrated Detective Harper advised the Defend-
> ant of his Miranda rights and of the charged levied
> against him in the indictment.The defendant himself did
> not recall or deny being advised of these rights. None-
> theless, the Defendant acknowledge what Miranda rights
> are. While the Defendant was under significant medica-
> tion throughout his hospital stay. Nurse Fourney testi-
> fied reaction to medication is case specific. Ms.Fourney
> and all other witnesses testified the Defendant at all
> times appeared to be alert, responsive, and extremely
> talkative, often voluntaring information including
> inculpatory statements. Considering all the testimony
> and evidence produced at the hearing, the Court found
> and concluded defendant's statements were voluntary and
> are admissible at trial under the requirements of
> 18 U.S.C § 3501."

See(District Court's Order April 1996 attached)

At the April 10, 1996 suppression hearing Defendant called

Catherine Fourney a registered nurse who worked at the Charleston

Area Medical Center who upon being examined by defense counsel testi-
fied as follows:

Q. Did any person who is a member of the task force at the time  that
Mr.Little was in  the hospital appear in his hospital room with him?
See(S.H page 4 lines 18-20)


A. When he was admitted our charge nurse told us because I was the
one who admitted him that he would be coming up and that he was in
handcuffs and he would have an officer with him at all times and that
every hour they rotated the hand cuffs, so there was a police officer
or some type of officer at all times in the room.See(S.H pg 4 lines
21-25 and pg 5 lines 1-2)


Q. And in the course of your regular day-to-day activities as a
registered nurse did you keep notes on Mr.Little's progress or condit-
ion. See(S.H. 5 lines 13-15)


A. Yes. We have the chart on every patient on every shift. See (S.H pg
5 lines 16-17)


Q. Now, you have an entry there, Ms.Fourney, can you please read that
to me? See( S.H pg 8 lines 12-13 )

A. It says, "respiration systemmetrical and non labored,distal pulses
times four plus two. See ( S.H pg 8 lines 14-15)

The Court: Could you slow down. See (S.H pg 8 line 16)


A. All  right, sir. Abdonmen soft, non tender, bowel sounds osculated
times four, Foley to bed side patient draining clear yellow urine.
Data base complete and has my name, C.Forney. And on 0528 there is
another entry and it says, "patient throwing up blood, goes right
back to sleep/ C.Forney RN". See(S.H pg 8 lines 17-23)

Q. Based upon the typed document, which I believed is the first docu-
ment in chronology, December 13th of 1995, does-is there an indication
on there as to what medication ,r.Little was....See (S.H pg 11 lines
22-25)

A. He received Demoral 50 milligrams IV q four hours prn. See (S.H pg
12 lines 1-2)

Q.Based upon  your knowledge and expertise as a nurse, what type of
effect does demoral have? See (S.H 12 lines 5-6)

A. It's situational specific. Some people get demoral every hour because
their body builds up a tolerance to it, so I mean some people it help
it's just diifferent for different people. See (S.H pg 12 lines 7-10)

Q. Does it have any impact,based upon your experiemnce as a nurse, on
their ability to comprehend or undersatnd what you are saying to
them? See (S.H 12 lines 11-14)

A. Sometimes people do, but that's why we chart it it's called orient-
ed times three. You ask them questions and you have to identify
people are oriented to that so if it affects them you can tell because
you to orient the person. See (S.H 12 lines 15-19)

Q. Is there any refereence there in your notes to his ability to com-
municate or whether or not he was oriented? See (S.H pg 21 lines 18-20)

A. Yes, I have him alert. I have him as uncooperative. He was alert
to person and I don't have him communicating anything to me. See (S.H
21 lines 21-23)


Defendant called Gloria Watson a registered nurse who worked dur-

ing the time frame he was a patient at CAMC at the suppression hearing

held on April 10, 1996 who testified as follows:

Q. And you have hand written notes to that and can you tell me what
that says? See ( S.H pg 25 lines 10-11)

A. The notes that I wrote at 9:30 am? See (S.H pg 25 line 12)

Q. Yes. See (S.H pg 25 line 13)

A. Checked patient. Noncommunicative for the most part. IV noted to
be out. IV therapy called for restart. Left wrist and bilateral ankles
were shackled. Non constrictive as far as circulation, however patient
complains of numbness to right foot. Shackles on but can fit two
fingers between the shackles and skin. See (S.H pg 25 lines 14-20)

Q. Ms.Watson, I don't mean to interrupt you but on your initial entry
you described Mr.Little as being noncummunicative. Do you have any
independent recollection as to why you put that entry down. See(S.H
pg 25 line 25 and pg 26 lines 1-3)

A. I can just remember going in and talking to him and him not not
talking --not talking hardy at all. See (S.H 26 lines 4-5)

Q. Was he --was he asleep or making noises? See (S.H pg 26 line 6)

A. It just seemed to be that he didn't want to talk. He didn't seem
to be sedated. I mean that I remember . It's possible that he could

have been, but he seemed to me that he just did not want to talk to
us. See (S.H pg 26 lines 7-10)

The case agent Steve Harper testified at the suppression hearing
as follows:

Q. And at the time you Mirandized him, what was his physical condition?
See (S.H pg 92 lines 9-10)

A. He was lying on the ground. See (S.H pg 92 line 11)

Q.And at that time was he making any noises or communicating at all?
See(S.H pg 92 lines 14-15)

A. No, not at that point. I proceeded to pick him up to stand him back
up on his feet  when he was complaining of his back, and that's when
we called the ambulance. See (S.H pg 92 lines 16-19)

Q. So at the  time, let me make sure I understand this, at the time
you Mirandized him, he was on his stomach with his hands cuffs. And
Mirandizing him at some point you picked him up an  put him on his
feet. See(S.H pg 92 lines 20-23)

A. Attempted to. See (Pg 92 line 24)

Q. When you Mirandized him did he appear to be in pain? See (S.H pg 92
line 25 and pg 93 line 1)

A. No, he didn't complain of no pain. See (S.H pg line 2)

Q.Did he complain of anything? See(S.H PG 93 line 3)

A. No, he was listening to me is what he was doing. See (S.H pg 93
line 4)

Q. How do you know that he was listening to you? See (S.H pg line 5)

A. Because he was very attentive to what i was saying. See (S.H pg 93
line 6)

Q. Specifically,did he communicate with you at all? See (S.H pg 93
line 7)

A. No, not at that point in time. See(S.H pg 93 line 8)

Q. And you were on the scene within a minute of that type of fall.See
(S.H. pg 94 lines 4-5)

A. yes. See (S.H pg 94 line 6)

Q. Do you recall him saying anything to you that was discernible? See (S.H pg 95 line 1-2)

A. No, not at that point.That's about when I picked him up and real-lized that he had some injuries that needed to be taken care of. See (S.H 95 lines 3-5)

Q. Did you ever have any concern at all at any subsequent time that perhaps you should Mirandize Mr.Little again after he was in his hosp-ital bed recoving. See (S.H pg 95 lines 22)

A. No. See (S.H pg line 95)

Q. That was never discussed with anyone? See (S.H pg 95 line 23)

A.No. See (S.H pg 95 line 24)


On cross-examination by A.U.S.A Monica Schwartz agent Steve

Harper testified as follows:


Q. After he told you  he understood his Miranda warnings did he advise you that he had pain in his back? See (S.H pg 96 lines 13-15)


On re-direct detective harper testified when questioned by the

defense as follows:


Q. Officer Harper, I asked you on my examination of you what communi-cations any whatsoever, that Mr.Little had with you at that scene. And I believe your testimony was that he said yes, I understand. Now are you saying that he..See(S.H 96 lines24-25 and 97 lines 1-3)

A. No. he did'nt say yes. I understand. He ackowledged to to me that he understood. See (S.H 97 lines 4-5)

Q. Verbally? See (S.H 97 line 6)

A. Yes, i don't remember if he said yes. He indicated to me that he did. I believe it's more of a you understand, trash, what I'm saying And it's more of the yeah. See (S.H 97 lines 7-10)


The defendant testified at the supprression hearing on examinat-

ion by counsel Mr.Heavens in part as follows:

Q. You heard detective harper state that he provided you with Miranda warnings. See (S.H 101 lines 16-17)

A.Yes. See (S.H line 18)

Q. Do you recall him providing you with Miranda warnings as he stated
he did here in court today? See (S.H 101 lines 19-20)

A. I don't remember. See (S.H 101 line 21)


     The AUSA Schwartz cross-examination of Defendant is in part as

follows:

Q. So you know that when you're arrested you have the right to remain
silent is that correct? See (S.H 102 lines 5-6)

A. not if I don't know at the time it I aint---If i don't understand

--I mean I guess I don't--at the time don't really know.

Q. What you testified to on direct was that you didn't remember, is that
your testimony? See (S.H 102 lines 10-11)

A. Yes. See (S.H line 12)


     Defendant proceeded to trial to hold the government to its burden

of proof and on the second day of trial the trial judge advised the

jury when detective Neddo was testifying to the Defendant's allegedly

incriminating statements as follows:


The Court:"I will tell the jury that I  have previously heard evidence
on this point, and I have held that the statements were voluntarily
made sufficient to place those statements before the jury and". See
(T.T 445 lines 13-17)

     The following is MDent officer Henderson III testimony at defend-

ant's trial on cross-examination by  defense counsel Mr.Heavens in

part on May 1, 1996 as follows:

Q. You understood when Mr.Little was making these alleged statements
to you that it could seriously affect his guilt or innocence? See(TT
470 lines 10-12)

A. Well,at the time when I was talking to him, no because I thought it
was general conversation. I never thought it would be used again.See
(T.T 470 lines 13-15)

Q. Did you initiate conversations with him? See (TT 470 line 19)

A. I'm sure I did. See (TT line 20)

At the defendant's trial mDent officer Crawfoprd gave the below
testimony on May 1, 1996 on direct examination when questioned by AUSA
Wright in part as follows:

Q. Can you describe the area in which you found this? See (TT 481 line
13)

A. yes. there was a little bit of snow on the ground kind of like a
grassy rocky area combined. There was an impression of a body apparent-
ly where Mr.Little had jumped over the side. See (TT 481 lines 14-17)

Officer Crawford testified on cross examination by defense counsel
Heavens as follows:

Q. ---were made to you by Mr.Little, did you think those statements
could be very important in this case? See (TT 489 lines 8-9)

A. Possibly. See (TT 489 line 10)

The agent Mdent officer Harper  was called by the Defense and
testified on May 2, 1996 as follows:

Q. Did you yourself, guard Mr.Little? See (TT 507 line 15)

A. yes. I did. I was there on two occassions. See (TT 507m line 16)

Q. Okay. But you didn't testify here in the government's case in
chief as to statements Mr.Little allegedly made to you , did you? See
(TT 507 17-19)

A. No. I did not. See (TT 507 line 20)

Q. You understand that any type of incriminating statements that is
made by a suspect can be used in court of law against him. See(TT 511
lines 7-9)

A. yes ,sir. See (TT 511 line 10)

Q, As the case agent on  the case you have no information to suggest
that Mr.Little was ever found with drugs on his person do you,Detect-
ive Harper? See (TT 511 lines 18-20)

A. I don't recall.  I don't think so no. See (TT 5ll line 21)

Q. Certainly no drugs were introduced here at trial that were allegedly

linked to Mr.Little; is that a fair statement? See(TT 5ll lines 22-24)


A. That's a fair statement. See (TT 5ll line 25)

Q. And by the same token, you are not aware of any of Mr.Little's fing-
er-prints on containers of drugs or money or anything of that nature
is  that a fair statement? SEE(TT 512 lines 1-4)

A. That's fair. See (TT 512 line 5)

Q. And I believe you told the jury about what a controlled buy is. You
don't have any controlled buys on Trevor Little, do you,Detective Harper?
See(T.T 512 lines 10-12)

A. No,I do not. See(T.T 512 line 13)

Q. And you don't have any video tapes of Trevor Little doing anything
illegal, do you? See (TT 512 lines 14-15)

A. No, I do not. See (TT 512 line 16)

Q. No audio  tapes? See(TT 512 line 17)

A. No sir. See(TT 512 line 18)


     The trial judge instructed the jury at Defendant's trial as

follows:

          "You also heard testimony from law enforcement
          officers regarding alleged statements made by one
          of the defendants ,Trevor Little,while he was in
          the hospital.I have allowed evidence of those alleged
          statements to be presented to you.See (TT 534 lines 12-16)

          Now in determining whether an individual under your
          consoideration was a member of an alleged conspiracy
          you should first consider only that evidence, if any
          pertaining to that defendant's own acts statements.
          A defendant is not responsible for the acts... until
          it is established beyond a reasonable doubt, first that
          a conspiracy existed and secondly, from the evidence
          of his own acts and statements... On the other hand,
          if and when it does appear beyond a reasonable doubt
          from the evidence that a conspiracy did exist...then
          the statements. . . made . . .may be considered by
          you as evidence against that particular defendant
          ...each member is bond by or responsibile for the

statements ...any admissible or incriminatory
statement made or...done outside of court by one
person may not be considered as evidence in the
case agsainst any person who was not present.
See(TT 588 lines 14-25 and pg 589 lines 1-20)

Defendant's arrest warrant was dated december 18,1995 signed by
issuing officer Ronald D.Lawson, clerk by Magistrate Judge Jerry D.
Hodge by arresting officer Sgt.J.H.Crawford. The Presentence Invest-
ation Report prepared by the probation officer Ms.Martha Newberry
paragraph 80 in part states as follows:

The defendant also has approximately $5,000
in medical Certer Hospital expenses at
Charleston Area Medical Certer Hospital,
Charleston, West Virginia.

On the defenfant's direct appeal he raised the following Issues
regarding the allegedly incriminating statements admission.

1. Fifth Amendment violation.
a. failure of Government to Establish Voluntary waiver.
b. Impermissible coercion
c.Interrogation
d. Sixth Amendment violation.

In the government's response brief in part it stated/ argued as
follows:

"Trevor complains that the statements he made
to police officer while hospitalized should
have been suppressed as he was not able to
understand the essence of his Miranda warnings
because of the injuries he suffered after he
fell off a 50 foot cliff in an effort to evade
arrest . . .'In determining whether a confession
was freely and voluntarily made within the  mean-
ing of 18 U.S.C § 3501,the government is not
required to prove voluntariness beyond a reason-
able doubt, but only demonstrate that fact by a
preponderance of the evidence". . . . In this
case Trevor was not interrogated at the hospital
by any of the agents at the time of his statements-
...and Trevor's criminal history suggest that he
would generally be familiar with his rights.

See(Brief of Appellee pages 21-24 attached)

The Fourth Circuit panel Judges Hall, Murnaghan and Niemeyer held in part as follows:

> we find that none of these factual findings is
> clearly erroneous. We further conclude that
> these findings support the Court's decision
> to admit trevor's incriminating statements under
> 18 U.S.C § 3501 (1994) in the prosecution of both
> Appellants.

See (Opinion attached)

The Defendant contends that since his direct appeal and 28 USC § 2255 motion the Supreme Court have held 18 USC 3501 unconstitutional. See <u>Dickerson v. United States</u>, 147 L.Ed 2d 405 (2000)("Because of the obvious conflict between our decision in Miranda and § 3501,we must address whether Congress has constitutional authority to thus supersede Miranda. If Congress has such autoirity, § 3501's totality-of-the- circumstances approach must prevail over Miranda's more specific requirements.").at 415

The High Court went on to say," As discussed above,§ 3501 explicitly eshewed a requirement of pre-interrogation warnings in favor of an approach that looks to the admistration of such warnings as only one factor in determining the voluntaries of a suspect's confession. The additional remedies cited by amicus do not in our view render them, together with § 3501 an adequate substitute for the warnings required by Miranda". at 418-419

In Miranda, the Supreme court noted that reliance on the traditional-totality-of-circumstances test raised a risk of overlooking an involuntary custodial confession. 384 U.S.At 457,16 L.Ed 2d 694, 86 S.Ct 1602, a risk that the Supreme Court found unacceptably great when the confession is offered in the case in chief to prove guilt. See

Dickerson,supra,("As discussed above § 3501 reinstates the totality
test as sufficient. Section 3501 therefore cannot be sustained if
Mirand is to remain the law").at 419

The District Court had overlooked, the concussion factor Defen-
dant sufferd, the Post-Concussion Symdrome and the effects that
medication had on defendant during his hospital stay while police
officers were interrogating him. That is why the District Court's
April 12, 1996 Order have not mentioned that the defendant suffered
head injuries, which is in pertinent part as follows:

> "Dr.Mark Anthony Choeuiri testified Trevor was
> patient at CAMC. Dr.Choeuiri testified Trevor
> had fallen and fractured his back. Dr.Choeuiri
> did not recall whether the Defendant suffered
> head injuries from the fall.

See(Order of April 12, 1996 at page 5 attahced)

The Wikiipedia defined Post-Concussion-Syndrome (hereinafter)
referred to as PCS in part as follows:

> Signs and Symptons:Signs and symptoms such as
> noise sensitively,problems with concentration
> and memory, irritability,depression,anxiety,
> fatigue and poor judgment may be called late
> symptoms because they generally do not occur
> immediately after the injury, but rather days
> or weeks after...Also, headache and dizziness
> occur immediately after the injury and can be
> long lasting.
> higher mental functions:Cognitive or mental
> symptoms can include confussion,problems with
> attention, impaired judgment, and amnesia or
> other problems with memory, especially short-
> term memory. Problems with memory and attention
> are the longest-lasting cognitive symptoms,one
> in four people with PCS still suffer from memory
> problems a year after the injury. PCS may cause
> slowed information processing and reaction to
> stimuli or difficulty with abstract thinking
> or problem solving.

This is the reason why when AUSA SChwartz questioned the

Defenant at the suppression hearing on April 10, 1996 regarding his rights being read the Defendant answered with difficulty as if the question was processing slow in his mind, which is ass follows:

Q. So you know that when you're arrested you have the right to remain slient is that correct? See (Suppression hearing April 10,1996 page 102 lines 10-11)

A. Not if I don't know at the time it I-aint ---If I don't understand ---I mean I guess I don't---at the time don't really know.See(S.H page 102 lines 12-14 attahced)

Secondly, the Defendant  wa given Demoral as testified to at the suppression hearing after he suffered his immediate concussion.

At drug Information.Com it defines Demoral Side effects by inject-ion in  part as follows:

> "The most frequently observed advverse reaction
> include lightheadedness, dizziness,sedation,
> nausea, vomiting nad sweating."

Defendant was given Tylox after his concussion during his stay in the hospital while MDent officers were interrogating him in his vulnerable and weak mind state. The Fourth Circuit have defined Tylox in foot note One .See United States v. Floresca,38 F.3d 706, (4th Cir.1994)("Tylox is the trade name for oxcodone hydrochloride compounded with acetaminophen, a pain-killer with morphine-like properties").

The Supreme Court in Townsend v. Sain, 9 L.Ed 2d 770 (1963) when faced with whether a defendant's confession was voluntarily after he had been injected with a medicine that produces both a

(15)

physiological and psychological condition could adversely affect
the mind and will of the Defendant ruled that it is a probability
that the subject was removed from the scope of reality. See Town-
send,("If an individuals will was overborn or if his confession was
not the product of a rational intellect and a free will, his confess-
ion is inadmissible because coerced. These standards are applicable
whether a confession is the product of physical intimidation or
psychological pressure and,of course, are equally applicable to a
drug-induced statements. It is difficult to imagine a sitaution in
which a confession would be less the product of a free intellect
less voluntary, then when brought about a drug having the effect
of a "truth serum".).at 782

Any questioning by MDent officers ,which was not the product
of a free intelect renders that allegedly confession inadmissible
at the defendant's trial.

Due to the fact the District Court used § 3501 totality-of- the
circumstance test, which was overruled by Dickerson,supra,in Defen-
dant's case without considering both the concussion and medication
intake at the suppression hearing this Court have jurisdiction to
hold an evidentiary hearing on this matter. See Townsend,supra,
("The problem of the power of duty of federal judged, on habeas
corpus, to hold evidentiary hearing-that is, to try issues of fact
anew-is a recurring one...Since Frank v. Mangum, 237 US 309,331,this
Court has recognized that habeas corpus in the federal courts by one
convicted of a criminal offense is a proper procedure 'to safeguard
the liberty of all persons within the jurisdiction of the United
States against infringement through any violation of the constitution

(16)

even though the events w hich were alleged to infringe did not appear
upon the face of the record of his conviction.". Hawk v. Olson,326 US
271,274, 90 L.Ed 61, 64 Brown v. Allen, and numerous other cases have
recognized this ... the opportunity for redress, which presupposes the
opportunity to be heard to argue and present evidence, must never be
totally foreclosed. . . Therefore, where an applicant . . .alleges
facts which, if proved, woulod entitle him to relief, the and try the
facts anew.").at 783-785

Defendant was under the Fourth Circuit's landscape of the law
during the time of his suppression hearing. See United State v. Dicker-
son, 166 F.3d 667 (4th Cir.1999)("As a consequence,§ 3501,rather than
Miranda governs the admissibility of confessions in federal court.
Accordingly, the district court erred in suppressing Dickerson's
voluntary confession on the grounds that it was obtained in technical
violation of mind").at 671 (Overruled by the Supreme Court)See Dicker-
son,supra,("In Miranda, the Court noted that reliance on the tradit-
ional totality-of-the-circumstance test raised a risk of overlooking
an involuntary custodial confession,384 US,at 457,16 L.Ed 2d 694,86
S.Ct 1602, a risk that the Court found unacceptably great when the
confession is offered in the case in chief tp prove guilt").at 419

Based upon the facts and legal authorities articulated herein
A Writ of audita querela should issue in defendant's case. See Kessack
 v. United States,(W.D Wa 2008)("Morgan teaches "that federal courts
may properly fill the interstices of the federal post-conviction remed-
ies available at common law".Doe,120 F.3d 203 (quoting United States
 v. Ayala,282 US App.D.C 266, 894 F.2d 425,428 (D.C.Cirl990)... This

Court relies on United States v. Morgan, to hold that Mr. Kessack's
exhaustion of his statutory rights under 28 U.S.C § 2255 does not bar
his petition for Writ of Audita Querela")

   Defendant's involuntary   confession was obtained without counsel
present should have been known that counsel attaches the moment a
person is charged and/ or arrested. See Feller v. United States, 157
L.ED 2d 1016 (2004)("The sixth Amendment right to counsel is trigger-
ed 'at or after the time that judicial proceedings have been initiated
...whether by way of formal charge, preliminary hearing, information
or arraignment").at 1022; Kansas v. Ventris, ___U.S.___,(2009)("Now
that we are confronted with the question, we conclude that the Massiah
right is a right to be free of uncounseled interrogation, and is
infringed at the time of the interrogation. That we think is when
the "Assistance of Cousnel" is denied. It is illogical to say that
the right is not violated until trial counsel's task of opposing
conviction has been undermined by the statement's admission into
evidence. . . We have never said; however that officers may badger
counseled defendants about charged crimes so long as they do not use
information they again. The Constitutional violation occurs when the
uncounseled interrogation is conducted").; Rothgery v. Gillespie,___,
US,___,(2008)("Attachment occurs when the government has used the
judicial machinery to signal a commitment to prosecute as spelled out
in Brewer and  Jackson. Once attahcment occurs, the accused at least
is entitled to the postattachment proceedings; what makes a stage
critical is what shows the need for counsel's presence. Thus counsel
must be appointed within a reasonable time after attachment to allow
for adequate representation at any critical  stage before trial, as

(18)

well as at trial itself.").

The Defendant in the present case was knocked unconscious upon
arrest from the 50 plus straight fall off a rock cliff, and upon
impact the MDent officers transported him to the CAMC hospital where
Defendant was immediately injected with an IV containing various
medications such as Demoral, Tylox and other drugs.

Although, the defendant could not remember whether he was Miran-
dized at the initial  place of the fall since it was 50 plus feet, but
it is evident he suffered a concusiion, was disorientated both at the
scene and in the hospital, where MDent officers tried to interrogate
him.

At no time did any of the officer's advised the Defendant of the
charges he was facing. The head injury was nver considered nor ruled
upon by the former chief Judge Haden II, nor was the rule announced
in Dickerson that the totality of the circumstrances test of section
3501 was unconstitutional.

Moreover, based upon the impact of Defendant's 50 foot fall he
was unconscious and disorientated when the alleged Miranda rights
were read, which does not qualify as being read to him. Defendant
have not made any statements to MDent offiers who prejured themselves
before his  suppression hearing and at trial and should have been
requested to take a polygraph test before their testimony went
before the jury.

It must be noted that officer Henderson III testied as a govern-
ment witness at the suppression hearing proceedings and trial-yet he
was caught with Billy-Hart (another-officer) in the Dyess case steal-
ing money and/or drug proceeds and testifying before courts that he

(19)

received $40,000 when in fact the seizure was $80,000. Henderson III have seince been forced to retire as a Charleston Police officer.

Defendant would request a new trial based on the Dickerson,supra, ruling, the concussion suffered by defendant as outlined in Dr.Frederick H.Armbrust affidavit, memory lost and undisclosure of the effects of the medication given to him during his hospital stay that neither the former chief judge nor the jury heard.

There is a reasonable probability that the outcome of the proceeding would have been different and the involuntary statements would have been suppressed had the concussion/head injury,medication definitions been reviews along with the Dickerson ruling by the trial judge.See Townsend,supra,("But the crucially informative characterization of the drug, the characterization which would have enabled the judge and jury mere laymen, intelligently to grasp the nature of the substance under inquiry, was inexpliciably omitted from the medical experts testimony. Under the circumstances disclosure of the identity of hyoscine as a 'truth serum' was indispenable to a fair, rounded, development of the material facts. And the medical expert's failure to testify fully cannot realistically be regarded as Townsend's inexcusable default. See Fay v. Noia,9L.Ed 2d 868 (PArt-V)").at 791

As noted above none of the nurses testified to the effects the medication had on defendant at the April 10, 1996 suppression hearing.

CONCLUSION

Defendant prays that this Court grant his Writ of Audita Querela motion and grant him a new trial based on the Dickerson ruling. Moreover Defendant would like to be held to less stringent standards than

(20)

formal pleading drafted by attorneys. See Hainse v. Kerner, 404 U.S. 519, this be his prayer.


Dated 11, 26th ,2012

                                        *Trevor Little*
                                        Trevor Little
                                        I.D#05059-088
                                        P.O BOX 2068
                                        U.S.P Big Sandy
                                        Inez Ky 41224


                            (21)


                  CERTIFICATE OF SERVICE

I Trevor Little, hereby certify that I have sent a true and correct copy of the the"Petition For Writ of Audita Querela, pursuant to the All Writs Act 28 U.S.C § 1651(a), which is deem file timely upon placement in the legal mail Box at U.S.P Big Sandy, Inez Ky 41224. See Houston v. Lack, 101 L.ED 2d 245 (1988)


Dated 11, 26th ,2012

                                        *Trevor Little*
                                        Trevor Little
                                        I.D# 05059-088
                                        U.S.P Big SAndy
                                        P.O BOX 2068
                                        Inez Ky 41224

## DECLARATION OF TREVOR LITTLE

I,Trevor Little swear under the penalty of purjury that the fore-going is true and correct to the best of my ability.

During my stay in the Charleston Area Medical Center Hosptal no MDent officer advised me of the charges lodged against even after I inquired several times what I was being arrested for.

Moreover, no police officer advised me about any of the counts of the indictment from the start of my stay which was from December 12, 1996 to December 18, 1996. I also asked for counsel in the CAMC hospital to one of the older officers who guarded me that was hire ranked than Steven Harper that did not testified at the suppress-ion hearings held on both March 11,1996 and April 10, 1996,but was not appointed one in the hospital. I Trevor Little will take a lie detective test if called on to answer the above mentioed sworn on statements.

I swear that a above stated is true and correct pursuant to the penalties of perjury 28 U.S.C § 1746.

Dated, _11, 26th_ ,2012

Trevor Little
I.D#05059088
P.O BOX 2068
U.S.P Big Sandy
Inez Ky 41224

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

**ENTERED**

APR 1 2 1996

CLERK'S OFFICE U.S. DIST.
COURT, SO. DIST. OF W.VA.
RONALD D. LAWSON, CLERK

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                           CRIMINAL NO. 2:95-00198

TREVOR LITTLE, et al,

       Defendants.

O R D E R

On March 11, 1996 and April 10, 1996 came Defendant Trevor Little, in person and by counsel, Daniel Corey, and came Defendant Tyheim Little, in person and by counsel, Christopher J. Heavens, and came Defendant Lennie John, in person and by counsel, Gregory M. Courtright, and came Philip Wright and Monica K. Schwartz, Assistant United States Attorneys, for Pretrial Motions Hearings.[1]

Defendant Tyheim Little moved for a Bill of Particulars. The Court concluded the discovery being provided by the Government was adequate to provide Defendant with information sufficient to respond to the charges. Accordingly, the Court **DENIED** Defendant Tyheim Little's Motion for Bill of Particulars.

Next the Court addressed Defendant Trevor Little's "Motion to Suppress Written or Oral Statements Allegedly Made by the Defendant."

---

[1]All the aforementioned individuals were present at the March 11, 1996 Pretrial Motions Hearing with one exception: John C. Parr, Assistant United States Attorney, appeared for Monica K. Schwartz.

*Exhibit #1*

Detective Stephen C. Harper of the Metropolitan Drug Enforcement Network Team ("MDENT") testified Defendant Trevor Little, fleeing from law enforcement officers, fell off a rock cliff approximately fifty feet above Route 21. Detective Harper estimated as many as ten people were present at the scene including himself, Detective Jack Jordan, Detective Steve Neddo, Sergeant Haynes, Detective Brian Jones, and Sergeant Gary Gunnoe.

At the foot of the cliff, MDENT agents placed Trevor under arrest. After the Defendant was face down on his stomach with his hands cuffed behind his back, Detective Harper advised the Defendant of his *Miranda* rights and informed him of the charges against him. Detective Harper believes Sergeant Gary Gunnoe had cuffed the Defendant a minute or less before Harper arrived. Detective Harper recalled Trevor was very attentive and said to Harper, "Yes, I understand my rights." At no time did Trevor request an attorney.

Detective Harper testified Trevor was conscious, alert, and appeared to understand what was being said to him. Because Trevor had injured his back in the fall, he was transported to Charleston Area Medical Center General Division ("CAMC"). Trevor remained at the hospital approximately one week. At all times, Trevor was guarded by MDENT officers. While in the hospital, Trevor volunteered several incriminating statements to the officers guarding him.

Detective Joseph H. Crawford of MDENT testified he had guarded Trevor at the hospital on two or three occasions. Trevor initiated

2

conversations with Detective Crawford.   Trevor appeared coherent and followed the level of the conversation.   When Trevor made statements of a criminal nature, Detective Crawford again advised Trevor of his right to remain silent.   Trevor acknowledged he understood, but wanted to talk because he knew he was in a great deal of trouble.

Detective Crawford did not take notes during the conversations.   Detective Crawford testified he takes a notebook with him when he proceeds to interrogate a witness.   He did not have a notebook with him on the occasions he guarded the Defendant. At a later date, Detective Crawford prepared a report of his general recollection of these conversations.

Detective Brian W. Jones of MDENT testified he was asked by Lieutenant Utt to guard Trevor.   Detective Jones believed Trevor was being treated with morphine for his back pain.   While he was with Trevor, Trevor appeared coherent and alert.   Again, Trevor initiated conversations with and made several incriminating statements.   Detective Jones did not have a notebook to record the content of these conversations.

Detective Stephen G. Neddo of MDENT testified he guarded Trevor on one occasion.   Detective Neddo testified Trevor carried on a monologue after Neddo advised Trevor he did not wish to talk with him.   Detective Neddo did not take notes of these conversations.   However, in January of 1996, at Detective Harper's direction Detective Neddo recorded what was said in a report.

Detective George L. Henderson III of MDENT testified he twice

3

guarded the Defendant at CAMC.   Detective Henderson explained Trevor was guarded because he posed a significant risk of flight and was a threat to the safety of others.   Detective Henderson recalled Trevor was pleasant generally.   Detective Henderson and Trevor had conversations in which Trevor made incriminating statements.   Henderson observed Trevor "talked a lot" during his eight hour shift.   Detective Henderson inquired further into the identity of an individual named by Trevor, "Uncle L."   Detective Henderson asked Trevor if "Uncle L" was the "guy in the wheelchair in Orchard Manor."

Cathryn Jo Fourney, a Registered Nurse in the trauma unit of CAMC, testified she recalled Trevor being a patient in her unit. Ms. Fourney recalled law enforcement officers being with Trevor at all times.   Ms. Fourney kept progress notes on Trevor's medical condition.   She recalled the Defendant was taking Demoral.   Ms. Fourney opined Demoral affects different people differently. However, Ms. Fourney testified Trevor was coherent when he was admitted to the hospital.

Gloria Watson, another nurse at CAMC, testified she recalled Trevor being a back injury patient at CAMC.   Ms. Watson remembered Trevor engaging in conversations.   Ms. Watson recalled Trevor talked to one officer more easily than the others.   Ms. Watson testified Trevor did not seem to be sedated, but was generally non-communicative.

Christine Jereza, a nurse at CAMC, testified she recalled Trevor as a patient with a back injury.   She remembered him

4

laughing and joking around with the officer in his room.   Ms. Jereza recalled he and the officer were "talking about things that were on the T.V. program."   Ms. Jereza further testified Trevor was always alert.

Dr. Mark Anthony Choeuiri testified Trevor was his patient at CAMC.   Dr. Choeuiri testified Trevor had fallen and fractured his back.   Dr. Choeuiri did not recall whether the Defendant suffered head injuries from the fall.   Dr. Choeuiri recalled Trevor was stable overall.

Lieutenant Stephen L. Utt, supervisor of MDENT, testified he was present when Trevor was arrested but did not witness the Defendant being advised of his rights.   Lieutenant Utt specifically asked Detective Harper whether he had given Trevor his *Miranda* warning.   Detective Harper responded affirmatively.   Lieutenant Utt further testified Trevor was conscious but appeared to be in pain at the time of the arrest.

Information given Lieutenant Utt by the officers guarding Trevor was that Trevor was being open and friendly with the officers.   Lieutenant Utt advised the officers to begin taking notes of what they saw and heard.   Lieutenant Utt did not advise his officers to secure a written *Miranda* waiver from the Defendant.

After being sworn, Defendant Trevor Little testified he does not remember Detective Harper advising him of his *Miranda* rights. However, the Defendant admitted he knows what *Miranda* rights are, having been arrested previously.

At the conclusion of the testimony, the Court made the

5

following findings of fact and conclusions of law. The Court considered significant the time lapse between Defendant Trevor Little's arrest and arraignment. The Court found the lapse was justified in this case because of Defendant's need for hospitalization and treatment of his significant injuries.

The Court found the evidence clearly demonstrated Detective Harper advised the Defendant of his *Miranda* rights and of the charges levied against him in the indictment. The Defendant himself did not recall or deny being advised of these rights. Nonetheless, the Defendant did acknowledge he knows what *Miranda* rights are.

While the Defendant was under significant medication throughout his hospital stay, Nurse Fourney testified reaction to medication is case specific. Ms. Fourney and all other witnesses testified the Defendant at all times appeared to be alert, responsive, and extremely talkative, often volunteering information including inculpatory statements. Considering all the testimony and evidence produced at the hearing, the Court found and concluded Defendant's statements were voluntary and are admissible at trial under the requirements of 18 U.S.C. § 3501. Accordingly, the Court **DENIED** Defendant Trevor Little's Motion to Suppress.

The Court then addressed Defendant Trevor Little's Motion for Severance. Based upon the number of charges involved in this drug conspiracy, the Court concluded it would be highly inappropriate conduct separate trials. The Court **DENIED** Defendant Trevor Little's Motion for Severance. The Court **GRANTED** a severance out

of necessity to the recently apprehended Defendant Edwin Spence and Defendant Randy Christmas who remains a fugitive.

The parties represented to the Court all other pretrial motions have been resolved by mutual discovery and the agreement of the parties.  Accordingly, the Court ORDERS as follows:

1.  All disclosable grand jury materials shall be provided to the Defendant no later than 1:00 p.m. on the Thursday prior to trial.  Grand jury materials should be reviewed by counsel only and no copies will be provided to the Defendant.

2.  All remaining discovery materials must be exchanged no later than 1:00 p.m. on the Thursday prior to trial.

3.  The Clerk is directed to make available the jury questionnaires for the petit jurors on the panel to all counsel for the parties herein.

4.  The Court DENIES all other outstanding pretrial motions as moot.

The Clerk is directed to send a copy of this Order to counsel of record, the United States Marshal for the Southern District of West Virginia and the Probation Office of this Court.

ENTER:  April 12, 1996

Charles H. Haden II, Chief Judge

## AFFIDAVIT OF FREDERICK H. ARMBRUST, M.D.

STATE OF WEST VIRGINIA,
COUNTY OF KANAWHA, TO WIT:

      I, Dr. Frederick H. Armbrust, being first duly sworn, upon my oath, state:

1.      I examined Mr. Trevor Little at the Charleston Area Medical Center on December 13, 1995, and a copy of my Consultation Summary is attached hereto as "Exhibit A."

2.      As a result of my physical examination of Mr. Little and my review of Mr. Little's history and medical records, I found that Mr. Little suffered a concussion on December 12, 1996.

3.      Based upon a standard of reasonable medical certainty, it is my opinion that a concussion will typically cause a loss of memory or disorientation for up to one hour following the impact or trauma which causes the concussion.

4.      Based upon a standard of reasonable medical certainty, it is my opinion that Mr. Little suffered some degree of loss of memory or disorientation during the period immediately following the impact or trauma which caused his concussion.

Exhibit #2

And further this affiant saith not.

> OFFICIAL SEAL
> NOTARY PUBLIC
> STATE OF WEST VIRGINIA
> JUDY C. FLING
> 116 Jenkins Dr.
> Charleston, WV 25312
> My Commission Expires Aug. 10, 1998

NAME:

Taken, subscribed and sworn to before me, a Notary Public, in and for the County and State aforesaid, this _10th_ day of _April_, 1995.

My commission expires _August 10, 1998_.

_____
Notary Public

CHARLESTON AREA MEDICAL CENTER                    CONSULTATION SUMMARY
   Charleston, West Virginia
     General Division
     Memorial Division
     Women and Children's Division

**PATIENT:** Little, Trevor    **ROOM:** 516-1    **UNIT #** 09186903  **DATE:** 12/13/95

**CONSULTING PHYSICIAN:** Frederick H Armbrust, MD

**HISTORY:**

The patient is a 24 year old male, who suffered an injury while trying to run from the police while he was being arrested. The patient apparently jumped off an embankment 40-50 feet, which was an unbroken fall and the patient had transient loss of consciousness. He apparently staggered in ambulation across the street prior to being apprehended. The patient complained of back pain at the time of his initial assessment. The patient at this time complains of low back pain. Also pain involving the neck and left shoulder. Indicates difficulty with lifting left arm off the bed secondary to discomfort in the shoulder region. He does not describe any paresthesias or radicular type pain in any of the extremities. He denies headache or troubles in his vision.

**PHYSICAL EXAMINATION:**

The patient is alert, reasonably cooperative, does not appear in any distress. He is supine in the bed, has shackles on both legs and his right arm. The extraocular muscle movements are full. The pupils are equal and briskly reactive to light. Visual fields are full to confrontation without extinction. There is no facial weakness. The tongue is in the midline. Neurologic examination demonstrates evidence of good strength throughout. There is no gross sensory impairment and reflexes are symmetric. The patient has good position sense in both lower extremities and denies any paresthesias in the perirectal or peroneal region. The patient has a Foley catheter in place.

**RADIOGRAPHIC EVALUATION:**

Included cranial CT scan, which demonstrates no intracranial abnormality. A cervical spine series reveals no obvious abnormality. Thoracolumbar junctional x-ray demonstrates evidence of a mild compression fracture of L1 with associated very mild compression of L2. A CT scan is quite dramatic relative to comminution of fracturing. The study reveals disruption of the T12, L1 facet on the left side with the superior articular facet of L1 dislocated inferiorly from its relationship to T12 inferior articular facet. There is a fracture of the transverse process of L1 on the left. There is a fracture of the pars interarticularis and base of the pedicle on the right. There is an oblique fracture through the body of the vertebra on the left side just in front of the pedicle, which extends vertically through the vertebral body. There does not appear to be any significant spinal canal stenosis associated with this.

**IMPRESSION:**

   1)     Concussion.

CONSULTATION SUMMARY
ORIGINAL

Exhibit

A

## CONSULTATION SUMMARY - 2

**PATIENT:** Little, Trevor

**UNIT#:** 09186903

2)  Complex comminuted fracture L1, potentially unstable, but without major compression and without associated neurologic deficit.

## RECOMMENDATIONS:

Relative to the concussion, which suggests simple observation, I would anticipate that the patient could be immobilized, at least initially, in a thoracolumbar sacral orthosis, but surgical stabilization could be considered in view of the nature of this patient's fracture. I think, however, without any subluxation at the present time and without more severe compression, that it would be reasonable to try external immobilization realizing that the patient could develop evidence of progressive instability either in the form of pain or development of neurologic deficit. If this occurred, then surgical decompression and stabilization would be required. Dr. Kessel has consulted Dr. Molina for management of the lumbar fractures and therefore will defer at this point to Dr. Molina, since the patient has no focal deficit attributable to these fractures.

D:    12/13/95  8:10 P  Frederick H Armbrust, MD
T:    12/13/95  9:24 P  dh
Job #  201367
Copies mailed prior to physician review.

12/20/95

Date          Frederick H Armbrust, MD

cc:    Frederick H Armbrust, MD

## CONSULTATION SUMMARY
## ORIGINAL

Post-concussion syndrome - Wikipedia, the free encyclopedia
Case 2:12-cv-08385  Document 1  Filed 11/29/12  Page 34 of 38 PageID #: 34
Page 1 of 10

# Post-concussion syndrome

From Wikipedia, the free encyclopedia

**Post-concussion syndrome**, also known as **postconcussive syndrome** or **PCS**, and historically called **shell shock**,[1] is a set of symptoms that may continue for weeks, months, or occasionally a year or more after a concussion – a mild form of traumatic brain injury (TBI).[2][3][4] Symptoms of PCS, which is the most common entity to be diagnosed

| Post-concussion syndrome | |
| --- | --- |
| *Classification and external resources* | |
| ICD-10 | F07.2 (http://apps.who.int/classifications/icd10/browse/2010/en#/F07.2) |
| ICD-9 | 310.2 (http://www.icd9data.com/getICD9Code.ashx?icd9=310.2) |
| eMedicine | emerg/865 (http://www.emedicine.com/emerg/topic865.htm) |
| MeSH | D038223 (http://www.nlm.nih.gov/cgi/mesh/2012/MB_cgi?field=uid&term=D038223) |

in people who have suffered TBI,[3] may occur in 38–80% of mild head injuries.[5] A diagnosis may be made when symptoms resulting from concussion last for more than three months after the injury,[6] or it may be made starting within a week[7] or ten days of trauma.[8] In late, persistent, or prolonged PCS (PPCS), symptoms last for over six months,[7][9] or by other standards, three.[10]

The condition can cause a variety of symptoms: physical, such as headache; cognitive, such as difficulty concentrating; and emotional and behavioral, such as irritability. As many of the symptoms in PCS are common to, or exacerbated by, other disorders, there is a risk of misdiagnosis. Though there is no treatment for PCS itself, symptoms can be treated; medications and physical and behavioral therapy may be used, and patients can be educated about symptoms and their usual prognosis. The majority of PCS cases disappear after a period of time.

It is not known what causes PCS symptoms to occur and persist,[11] or why some people who suffer a mild traumatic brain injury (MTBI) develop PCS while others do not.[12] The nature of the syndrome and the diagnosis itself have been the subject of intense debate since the 19th century. However, certain risk factors have been identified; for example, preexisting medical or psychological conditions, expectations of disability, and older age all increase the chances that someone will suffer PPCS. Physiological and psychological factors present before, during, and after the injury are all thought to be involved in the development of PCS.[13]

## Contents

- 1 Signs and symptoms
    - 1.1 Physical
    - 1.2 Psychological and behavioral
    - 1.3 Higher mental functions
- 2 Causes
    - 2.1 Physiological
    - 2.2 Psychological
- 3 Diagnosis

*Exhibit #3*

- 3.1 Differential diagnosis
- 4 Treatment
  - 4.1 Medication
  - 4.2 Psychotherapy
  - 4.3 Education
  - 4.4 Neurotherapy
- 5 Prognosis
- 6 Epidemiology
  - 6.1 Risk factors
- 7 History
- 8 Controversy
- 9 References

# Signs and symptoms

The abbreviation PCS may also be used to mean *post-concussion symptoms*.[13] Symptoms can appear immediately, or weeks to months after the initial injury. Their severity lessens progressively over time. [14] The nature of the symptoms tends to change over time: they are most commonly of a physical nature following the injury, but tend to become predominantly psychological later.[15][16] Signs and symptoms such as noise sensitivity, problems with concentration and memory, irritability, depression, anxiety, fatigue, and poor judgment may be called 'late symptoms' because they generally do not occur immediately after the injury, but rather days or weeks after.[13] Nausea and drowsiness commonly occur two to four weeks after concussion and can be long lasting. Also, headache and dizziness occur immediately after the injury and can be long lasting.[13]

## Physical

The main PCS symptom is headache.[5] While most people have headaches of the same type they experienced before the injury, people with PCS often report more frequent or longer-lasting headaches. [5] Between 30 and 90% of people treated for PCS report having more headaches than they did before the injury, and between 8 and 32% still report them a year after the injury.[5]

Dizziness, the second most common symptom, occurs in about half of people with PCS and is still present in up to a quarter of them a year after the injury.[5] Older people are at especially high risk for dizziness.[5]

About 10% of people with PCS develop sensitivity to light or noise, about 5% experience a decreased sense of taste or smell, and about 14% have blurred vision.[5] People may also have double vision or ringing in the ears, also called tinnitus.[17] Loss of hearing occurs in 20% of cases.[18] PCS may cause insomnia, fatigue,[19] sleepiness, or other problems with sleep.[14] Other physical symptoms include nausea[20] and vomiting.

## Psychological and behavioral

Psychological symptoms, which are present in about half of people with PCS, may include irritability, anxiety, depression, and a change in personality.[5] Other emotional and behavioral symptoms include restlessness,[21] aggression,[22] mood swings, anger, decreased libido,[19] impulsiveness, loss of social judgment,[23] and lack of ability to tolerate stress or alcohol.[7] People with PCS may also display a lack of emotion,[24] or emotional lability.[20] Another common symptom—apathy, or lack of motivation—may result directly from the syndrome or be secondary to depression.[5]

## Higher mental functions

Cognitive or mental symptoms can include confusion or impaired cognition,[25] problems with attention, [18] impaired judgment,[13] and amnesia or other problems with memory, especially short-term memory. [5] Problems with memory and attention are the longest-lasting cognitive symptoms;[18] one in four people with PCS still suffer from memory problems a year after the injury.[5] PCS may cause slowed information processing and reactions to stimuli[5] or difficulty with abstract thinking[21] or problem solving.[17] People may also experience a decrease in abilities related to work performance or social interaction.[22] While cognitive symptoms usually resolve within a few months of injury, physical and emotional symptoms can last longer.[26] Most cognitive symptoms clear within half a year of the injury, and the longest-lasting ones, such as memory, attention and language problems, usually resolve within a year.[5]

# Causes

The question of the cause or causes of PCS and PPCS has been heavily debated for many years. It is not known to exactly what degree the symptoms are due to organic factors, such as microscopic damage to the brain, and to other factors, such as psychological ones.[24] The subjectivity of the complaints complicates assessment and makes it difficult to determine whether symptoms are being exaggerated or feigned.[5]

It is possible that some post-concussion symptoms are due to physical causes while others are psychological.[13] One hypothesis holds that physiological factors are responsible for early symptoms that occur after mild head trauma, whereas symptoms that occur later are due to psychological factors. [23]

While the cause of symptoms occurring shortly after head trauma is likely to be physiological, it is less clear whether PPCS has an organic basis,[27][28] and nonorganic factors are likely to be involved in symptoms that last longer than three months.[26] PPCS may be caused by physiological, psychological, or psychosocial factors, chronic pain, or an interaction of some or all of these.[29] The majority of experts believe that PPCS results from a mix of factors, including preexisting psychological factors, and those directly relating to the physical injury.[13]

## Physiological



TREVOR LITTLE ID#03051-087
P.O. Box 2063
U.S.P Big Sandy
Inez, Kentucky 41224

⟨⟩ 05059-088 ⟨⟩
Clerk Of Court
PO BOX 2546
Charleston, WV 25329
United States

NOV 27 2012
INEZ KY
41224

United States Penitentiary, Big Sandy, KY
P.O. Box 2067, Inez, KY  41224

The enclosed letter was processed through
special mailing procedures for forwarding to you.
The writer raises a question over jurisdiction
of this facility, you may wish to return for
clarification. If writer encloses correspondence
to another address, please return.  DATE:

0187 1 2